# CRIMINAL COMPLAINT

| | |
|---|---|
| **United States District Court** | DISTRICT<br>Eastern District of Pennsylvania |

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>MARTIN D. WEAVER<br>and<br>ERICA LABOY | DOCKET NO.<br>17- 1435<br><br>MAGISTRATE'S CASE NO. |

Complaint for violation of Title 21 United States Code § 846.

| NAME OF JUDGE OR MAGISTRATE | OFFICIAL TITLE | LOCATION |
|---|---|---|
| Honorable JACOB P. HART | U.S. Magistrate Judge | Philadelphia, PA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (if known) | |
|---|---|---|---|
| December 2016 - Present | Eastern District of<br>Pennsylvania | 88 Olympia Lane<br>Sickerville, NJ 08081 | 1831 E Clementine Street<br>Philadelphia, PA 19134 |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

One: Beginning in or about December 2016 and continuing through on or about October 26, 2017, in the Eastern District of Pennsylvania, defendants MARTIN D. WEAVER and ERICA LABOY, did conspire, with others known and unknown, to knowingly and intentionally distribute a controlled substance outside the usual course of practice and not for a legitimate medical purposes, in violation of Title 21, United States Code, Section 846.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

## SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

| | |
|---|---|
| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title)<br>Bryan Lacy<br><br>OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE [1] | DATE |
|---|---|
| Honorable JACOB P. HART, United States Magistrate Judge | 10/24/17 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### AFFIDAVIT IN SUPPORT OF ARREST WARRANT

I, Bryan Lacy, depose and swear as follows:

### Background of Affiant

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI")
since 2010.  I am currently assigned to the Philadelphia Field Office where I investigate Health
Care Fraud including violations of Title 18, United States Code, Sections 1349 and 1347, among
others, and the distribution of controlled substances including violations of Title 21, United
States Code, Sections 846 and 841(a)(1), among others.  I have written, sworn to, and executed
numerous search warrant affidavits.  I have investigated and participated in the investigations
and prosecutions of doctors, pharmacists, and drug dealers.  I have directed cooperating
witnesses to conduct consensual recordings and assisted other investigators in consensual
recordings during which prescriptions and prescription drugs have been purchased from doctors
and pharmacists as well as from unlicensed individuals.  Investigations for the distribution of
controlled substances often focus on licensed doctors, pharmacists, or other health care
professionals who sell prescriptions for controlled substances to their so-called "patients" who
are in reality addicts and drug dealers.  My investigations, and those of the other investigators
with whom I have worked, have also involved other federal criminal laws related to money
laundering, currency structuring, and tax evasion.

2.      In the course of my investigations of violations of these laws, I have learned that
some doctors and other health care providers licensed to dispense controlled substances

1

knowingly sell controlled substances and/or fraudulent prescriptions to cash buyers, such as addicts and drug dealers, for no legitimate medical purpose and outside the normal course of professional practice.  I have also learned that because this illegal drug dealing generates large amounts of cash, these doctors often attempt to launder drug proceeds by, among other things, concealing the cash at their offices, residences, safety deposit boxes, or by depositing and shifting funds into and among various financial accounts.

### **Purpose of the Affidavit**

3.      The FBI, the Drug Enforcement Administration (DEA), and the U.S. Department of Health and Human Services, Office of Inspector General (HHS-OIG) are investigating Philadelphia-area medical doctor MARTIN D. WEAVER (WEAVER) for the illegal distribution of controlled substances and related crimes.  As explained in detail below, I have probable cause to believe that WEAVER, his receptionist, ERICA LABOY (LABOY), and others known and yet unknown have committed and are committing, within the Eastern District of Pennsylvania, violations of 21 U.S.C. § 846 involving a conspiracy to distribute controlled substances. Evidence gathered in this investigation has shown that WEAVER operates his medical practice, with the assistance of LABOY as a prescription "pill mill" whereby addicts and drug dealers obtain prescriptions for dangerous and frequently-abused controlled substances from WEAVER in exchange for cash without there being any legitimate medical purpose for the prescription. WEAVER provides the presciriptions for controlled substances without a real doctor/patient relationship, and outside the normal course of professional practice, in violation of 21 U.S.C. § 846.

The information contained in this affidavit is based upon, but not limited to:

2

  a. The general experience in drug investigations of myself and other law enforcement officers who have participated in this investigation;

  b. My own observations and the information and observations of other law enforcement authorities involved in this investigation;

  d. Consensually recorded office visits by a Cooperating Witness (CW); and

  e. Prescriptions for controlled substances the CW purchased from WEAVER.

## Applicable Laws

4. The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States. See 21 U.S.C. §§ 801-971. Title 21, United States Code, Section 841, provides that "[e]xcept as authorized, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense with intent to manufacture, distribute or dispense, a controlled substance." Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery. Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations . . . relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

5. Thus, under the Controlled Substances Act, licensed doctors may issue prescriptions for controlled substances but only legitimately so: the prescriptions must be for real patients with real medical conditions. The Attorney General of the United States has exercised rulemaking authority regarding the dispensing of controlled substances through the promulgation

3

of Title 21, Code of Federal Regulations, Section 1306.04, governing the issuance of

prescriptions, which provides:

> a prescription for a controlled substance to be effective must be issued
> for a legitimate medical purpose by an individual practitioner acting in
> the usual course of his professional practice. The responsibility for the
> proper prescribing and dispensing of controlled substances is upon the
> prescribing practitioner, but a corresponding responsibility rests with
> the pharmacist who fills the prescription. An order purporting to be a
> prescription issued not in the usual course of professional treatment or
> in legitimate and authorized research is not a prescription within the
> meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the
> person knowingly filling such a purported prescription, as well as the
> person issuing it, shall be subject to the penalties provided for
> violations of the law relating to controlled substances.

6.      Thus, Title 21, United States Code, Section 841(a)(1), makes it a crime to

knowingly and intentionally distribute a controlled substance other than in the usual course of

professional practice and for a legitimate medical purpose.   Title 21, United States Code,

Section 846 makes it a crime to attempt or conspire to violate Section 841(a)(1).

7.      The Controlled Substances Act categorizes drugs into five schedules based on

their medicinal value, potential for abuse, and safety.   Schedule I drugs (such as heroin,

marijuana, and LSD) have a high potential for abuse and no currently accepted medical use.

Schedule II drugs include a narcotic drug controlled substance, such as oxycodone.   Abuse of

Schedule II controlled substances may lead to severe psychological or physical dependence.

They can be used legitimately as painkillers.   However, these drugs also are frequently abused.

Drugs on Schedules III through V also have medical uses and successively lower potentials for

abuse and dependence.   Abuse of Schedule III controlled substances may lead to moderate or

low physical dependence or high psychological dependence.   Abuse of Schedule IV controlled

substances may lead to more limited physical dependence or psychological dependence relative

4

to the drugs or other substances in Schedule III.  All scheduled drugs, except those contained in Schedule I, are legally available to the public with a valid prescription.

8.      OxyContin is a brand name for a Schedule II drug manufactured by Purdue Pharma L.P., approved by the Food and Drug Administration (FDA) for the treatment of acute to severe pain lasting more than a few days.  The active ingredient in OxyContin tablets is oxycodone, a narcotic analgesic that is similar to morphine, and is also found in oxycodone combination pain relief drugs such as Percocet, Percodan, and Tylox.  Because of its controlled release property, OxyContin contains more of the active ingredient and needs to be taken less often than these other oxycodone containing drugs.

9.      Percocet is a brand name of a Schedule II drug which contains oxycodone and acetaminophen.  This combination of drugs is manufactured by numerous pharmaceutical companies under the following brand names: Endocet, Roxicet, Roxilox and Tylox.  This drug is used to treat moderately severe pain.  Percocet contains a narcotic and even if taken only in prescribed amounts, can cause physical and psychological dependence when taken for a long time.

10.     MS Contin is a brand name of another Schedule II drug manufactured by Purdue Pharma L.P. and approved by the FDA.  MS Contin is a long-acting extended release opiod pain medication.  The active ingredient in MS Contin is morphine.

11.     The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe controlled substances. Chapter 16.92 provides in pertinent part:

> (a)  A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board,

5

when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

(1)     Initial medical history and physical examination . . . . [B]efore commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days.   The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

(2) Reevaluations.   Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

(3) Patient counseling.   Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed.   Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

(4) Medical Records. [C]ertain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed.   This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient.   The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall

6

reflect changes in the symptoms observed and reported, in the
diagnosis of the condition for which the controlled substance is
being given and in the directions given to the patient.

## Background

12.     WEAVER is a medical doctor licensed in the Commonwealth of Pennsylvania,

medical license number MD042968L.   WEAVER is registered with the DEA under DEA

number BW9086061.   WEAVER maintains an office at 1015 Chestnut Street, Suite 500,

Philadelphia, Pennsylvania (CHESTNUT STREET OFFICE), and, from approximately April

2008 to June 2017, maintained an office at 21 South 12th Street, 10th Floor, Philadelphia,

Pennsylvania (12TH STREET OFFICE).

13.     LABOY is the office manager and/or receptionist for WEAVER.   The CW

observed LABOY in the 12TH STREET OFFICE and the CHESTNUT STREET OFFICE on all

but one of his/her visits.   LABOY screened "patients," typically collected the cash payments

from "patients" and scheduled follow-up appointments, among other things.   A check of

Pennsylvania prescription records revealed that LABOY received prescriptions for Oxycodone

on a monthly basis written by WEAVER from at least 2014 until as recently as September 2017.

LABOY also received weekly checks written from WEAVER's personal and business bank

accounts from at least 2012 until July 2017.

7

## Weaver's Drug Dealing

14.     In or around October 2016, a cooperating witnesses (CW) provided the following information to federal agents.[1]   CW said that he/she had a friend who was a former "patient" of WEAVER, who was not allowed to return to the practice for using Vicodin.   The CW told agents that WEAVER charged $300 in cash for the initial visit and $200 in cash per visit thereafter for prescriptions for controlled substances.   WEAVER required each pseudo-patient, who was, in reality, a customer, to provide an MRI report performed within the past year.

15.     In or around November 2016, CW visited the 12TH STREET OFFICE under the direction of your affiant or other federal law enforcement officers, while wearing a recording device.   CW asked the office manager, LABOY, what he/she needed to do to be seen by the doctor.   The CW told LABOY that he/she had been referred by an associate who was a former patient of WEAVER.   LABOY asked if the CW had health insurance and explained that WEAVER charged $300 cash for the first visit and $200 cash for monthly follow-up visits. LABOY took the CW's name and phone number, said that the CW would have to go through a "screening."   LABOY said she would try to call the CW later that day.   LABOY did not call

---

1 CW was identified as a participant in a drug distribution scheme involving another physician.   CW was approached by federal law enforcement officers, admitted to his participation in the scheme, and agreed to cooperate with the government.   CW entered into a cooperation plea agreement with the government and has been charged in an information with a single count of violating 21 U.S.C. § 846.   CW has also admitted to purchasing illicit prescriptions from another physician, using the fraudulent prescriptions for controlled substances to obtain drugs from pharmacies, and then selling the medication.   CW also was arrested in the Eastern District of Pennsylvania for conspiracy and distribution of marijuana in 1998 and was sentenced to 20 months imprisonment.   CW had several other arrests between 1988 and 2014, and convictions for Driving Under the Influence in 2011, for which CW was sentenced to one year of probation, and in 2014 for reckless endangerment, for which CW was sentenced to 18 months' probation, and in 2017 for Driving Under the Influence, for which CW was sentenced to 10 days house arrest.

8

the CW as scheduled   The CW attempted to call WEAVER's office on several occasions in

November 2016 without successfully getting through.

16.      In or around December 2016, the CW visited the 12TH STREET OFFICE under

the direction of your affiant or other federal law enforcement officers, while wearing a recording

device.   An unidentified female receptionist greeted the CW.   The CW requested an

appointment to see WEAVER.   The receptionist asked the CW if he/she had been through the

screening process to which the CW responded "no."   The receptionist then asked the CW the

following questions: 1) "Are you over the age of 25?" 2) "Do you live in PA?"   3) "Any drug

history?"   The CW explained that he/she had previously gone to another pain management

doctor.   The receptionist took the CW's information and went to the back of the office.   Shortly

thereafter, the receptionist returned and told the CW that WEAVER agreed to give the CW an

appointment.   The CW observed LABOY working in the office during the visit.

17.      Approximately one week later, the CW received a telephone call from the

unidentified female receptionist to schedule an appointment for the following day.   The

receptionist told the CW to bring his/her identification, medical insurance card, and $300 for the

visit.   CW was not asked to bring any medical records to the visit.

18.      Under the direction of your affiant and other federal law enforcement officers,

CW made eleven purchases of illegal prescriptions for Schedule II controlled substances from

WEAVER at the 12TH STREET OFFICE from approximately December 2016 until June 2017

and at the CHESTNUT STREET OFFICE from approximately July to September 2017.   Each

encounter between the CW and WEAVER except for the encounter on January 12, 2017, was

audio and videotaped.   After each purchase the CW gave the illegal prescriptions to your affiant

9

or another federal law enforcement officer.   Your affiant has reviewed the audio and video
recording of each visit and has confirmed that WEAVER sold illicit prescriptions to the CW
outside the usual course of professional practice, and without a legitimate medical purpose.[2]

19.     On or about December 15, 2016, the CW visited the 12TH STREET OFFICE
under the direction of your affiant or other federal law enforcement officers while wearing a
recording device.   LABOY gave the CW new patient paperwork to complete.   As the CW was
filling out the paperwork, WEAVER called the CW to an exam room.   In the exam room,
WEAVER asked the CW about his/her pain, history, and conducted a cursory evaluation of the
range of motion for the CW's legs.   Vital signs were not taken.   WEAVER explained to the
CW details of his "program" in which patients work their way up to getting a slow release opiate,
OxyContin or MS-Contin (up to 85 milligrams), for everyday use and a fast release opiate, "Oxy
30" for break through pain.   WEAVER went on to say that everyone starts off with Percocet 10
mg until an MRI is done.   WEAVER also told CW that they would try other treatments as well,
including topicals, creams, and trigger point injections, "whatever your insurance will cover."
The CW paid LABOY $300 in cash.   WEAVER asked the CW what pharmacy he/she used and
gave CW prescriptions for Percocet 10/325 mg, 120 pills; Zanaflex 4 mg, 90 pills; and Motrin
800 mg, 90 pills.

20.     On or about January 12, 2017, the CW visited the 12TH STREET OFFICE under
the direction of your affiant or other federal law enforcement officers while wearing a recording
device.   The CW paid $200 cash to an unidentified female receptionist, who was standing
behind the reception desk.   After filling out a form describing his/her pain level, the CW was

_____

2 When referenced in this affidavit, these recorded conversations are summarized but not transcribed verbatim.

called to a back room by another unidentified female, who identified herself as "Danielle".

Danielle asked the CW if he/she reviewed the opioid literature provided.   Danielle then had the

CW perform "Doctor Weaver's muscle test" described as "Seeing the range of motion in your

leg."   Vital signs were not taken.   Sometime later, WEAVER met with the CW and questioned

him/her on which pharmacy the CW used to fill the previous months prescription.   Weaver was

concerned because the prescription did not appear on the Pennsylvania Prescription Monitoring

Program (PMP) database[3].   WEAVER then called the pharmacy indicated by CW.   An

employee at the pharmacy told WEAVER that the CW did not fill his/her prescription at their

pharmacy.   The CW told WEAVER that he/she dealt directly with the pharmacy owner and

suggested that may be a reason the prescription was not entered into the PMP database.

WEAVER eventually told the CW to get things "straightened up" by his/her next visit and "you

will be eligible for an upgrade", meaning an increase in amount of opiates prescribed.

WEAVER gave the CW prescriptions for Percocet 10/325 mg, 120 pills; Zanaflex 4 mg, 90 pills;

and Motrin 800 mg, 90 pills.   The CW observed LABOY working in the office during the visit.

21.     On or about February 9, 2017, the CW visited the 12TH STREET OFFICE under

the direction of your affiant or other federal law enforcement officers while wearing a recording

device.   The CW paid an unidentified female receptionist $200 in cash and filled out a form

describing his/her pain level.   After waiting in the reception area for approximately 48 minutes,

WEAVER called the CW over to the receptionist's desk and asked if the CW was using the same

pharmacy as his/her last visit.   The CW fabricated a cover story, telling WEAVER that he/she

---

3 The December 2016 prescription from WEAVER was neither filled at a pharmacy nor entered into the
Pennsylvania Prescription Monitoring Program database.

11

was now using Rite Aid, since the other pharmacy would not fill WEAVER's prescriptions anymore.   WEAVER responded "Oh ok.   So Rite Aid now, right?"   Weaver then gave the CW prescriptions for Percocet 10/325 mg, 120 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills.   The CW's entire interaction with WEAVER occurred in the waiting room.   Likewise, the CW observed WEAVER hand prescriptions to two other "patients" who were in the waiting room at the same time as the CW.

22.     Following the February 2017 visit to WEAVER's office and at the direction of your affiant, the CW attempted to fill the prescriptions at a Rite Aid pharmacy in Philadelphia. A pharmacy employee told the CW that they could not fill the prescriptions because WEAVER's medical license was expired and attempts to contact WEAVER's office by telephone were unsuccessful.   A check of public records revealed that WEAVER's Pennsylvania medical license expired December 31, 2016 and was renewed February 21, 2017.

23.     On or about March 9, 2017, the CW visited the 12TH STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device.   The CW paid LABOY $200 in cash and filled out a form describing his/her pain level. The CW was taken to an examination room in the back and met with WEAVER.   WEAVER asked the CW if he/she was still using the same pharmacy.   The CW responded that he/she had to switch pharmacies because Rite Aid said WEAVER's credentials were expired and would not fill the prescriptions.   WEAVER stated that he had spoken with Rite Aid, and then asked about the new pharmacy.   The CW asked WEAVER for an "upgrade", which meant an increase in the opiates prescribed.   WEAVER told the CW that he/she needed a new MRI to base the upgrade on, and that he/she could get an MRI faster by going through his/her primary care physician.

12

The CW asked WEAVER about paying cash for an MRI, to which WEAVER responded "You are not allowed to pay cash for anything anymore. Everything has to go through insurance for opiates." WEAVER gave CW prescriptions for Percocet 10/325 mg, 120 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills. As before, the CW did not receive any medical examination nor was he/she asked any questions about his/her health.

24. On or about April 11, 2017, the CW visited the 12TH STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device. The CW filled out a form describing his/her pain level and paid LABOY $200 in cash. After waiting in the reception area for approximately one hour and 26 minutes, LABOY called the CW over to the receptionist's desk where WEAVER was standing. WEAVER asked the CW if he/she was still going to the same pharmacy. After the CW responded "yes", WEAVER handed the CW a prescriptions for Percocet 10/325 mg, 120 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills. The CW asked about an "increase" in opiates prescribed. WEAVER replied by asking the CW if he/she got an MRI. The CW responded that his/her MRI was in the medical file in WEAVER's hand. WEAVER then asked LABOY if the CW was "on the list..." LABOY replied that she didn't put the "thing" on the file. WEAVER told LABOY that the prescription was already written and then told the CW to give him some time to make some changes. After approximately ten minutes, WEAVER had the CW follow him to a backroom. After a brief discussion about the MRI, WEAVER handed the CW prescriptions for Oxycodone 15 mg, 60 pills; Docusate Sodium 150 mg, 60 pills; and Oxycontin 15 mg, 60 pills, without performing any medical examination. Immediately prior to LABOY calling the CW to the receptionist's desk, WEAVER had called two other "patients" to the receptionist's desk, one at a

13

time, and handed them what appeared to be prescriptions. The "patients" interaction with WEAVER occurred entirely in the waiting room.

25. On or about May 11, 2017, the CW visited the 12TH STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device. The CW filled out a form describing his/her pain level and paid LABOY $200 in cash. The CW asked LABOY to put something on the file to indicate he/she wanted an "increase" to the amount of opiates prescribed, to which LABOY replied affirmatively. While seated in the reception area, the CW overheard a conversation between LABOY and a "patient" known to law enforcement, about getting associates into WEAVER's practice as "patients." Sometime later, WEAVER called the CW over to the receptionist's desk and asked if he/she was still at the same pharmacy. When the CW asked WEAVER for an "increase," WEAVER took the CW to a backroom and asked if the CW knew his/her pharmacist, because the increase could cause a problem with the pharmacy. The CW reassured WEAVER that his/her pharmacist was "fine." After their conversation, the CW returned to the reception area and eventually WEAVER came out and gave the CW prescriptions for Oxycodone 30 mg, 60 pills; Zanaflex 4 mg, 90 pills; Motrin 800 mg, 90 pills; Oxycontin 15 mg, 60 pills; and Docusate Sodium 100 mg, 60 pills. As before, the CW received no medical examination and no vital signs were taken. There was no medical justification to increase the CW's Oxycodone prescription from 15 mg to 30 mg.

26. On or around June 8, 2017, the CW visited the 12TH STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device[4]. The CW paid LABOY $200 in cash and filled out a form describing his/her pain level.

_____

4 The CW attempted to make a consensual audio/video recording of the appointment, however there was a

14

While seated in the reception area, the CW overheard WEAVER tell another "patient" at the receptionist desk that as soon as he gets an MRI, they can make alterations to his medication. WEAVER appeared to hand out prescriptions in the waiting room to several "patients." The CW also obtained prescriptions from WEAVER in the waiting room with other "patients" present. WEAVER gave the CW prescriptions for Oxycodone 30 mg, 60 pills; Zanaflex 4 mg, 90 pills; Motrin 800 mg, 90 pills; Oxycontin 15 mg, 60 pills; and Docusate Sodium 100 mg, 60 pills. CW did not receive any medical examination nor was he/she asked any questions about his/her health. LABOY scheduled the CW a follow-up appointment card for July 2017 at WEAVER's new location, 1015 Chestnut Street, Suite 500 (CHESTNUT STREET OFFICE).

27.     On or about July 6, 2017, the CW visited the CHESTNUT STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device. The CW described the CHESTNUT STREET OFFICE as a room with a conference table and chairs. The CW did not observe any examination rooms. The CW paid LABOY $200 in cash and filled out a form describing his/her pain level. While the CW waited, he/she observed WEAVER as he handed prescriptions to three other "patients" in the waiting room. WEAVER then gave the CW prescriptions for Oxycodone 30 mg, 60 pills; Zanaflex 4 mg, 90 pills; Motrin 800 mg, 90 pills; Oxycontin 15 mg, 60 pills; and Docusate Sodium 100 mg, 60 pills. The CW's interaction with WEAVER occurred entirely in this "waiting room" with a conference table. Prior to leaving, the CW asked LABOY about getting an associate in to see WEAVER. LABOY told the CW to tell his/her associate to call or stop by WEAVER's office

---

malfunction with the equipment.

15

and use the CW's name to get in.  LABOY asked for the associate's name and phone number, which the CW then provided to LABOY.

28.    On or about August 3, 2017, the CW visited the CHESTNUT STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device.  The CW paid LABOY $200 in cash and filled out a form describing his/her pain level.  WEAVER gave CW prescriptions for Oxycodone 30 mg, 60 pills; Colace 100 mg, 60 pills; Oxycontin 15 mg, 60 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills.  The CW's interaction with WEAVER was purely transactional and occurred entirely in the room with the conference table.

29.    On or about August 31, 2017, the CW visited the CHESTNUT STREET OFFICE under the direction of your affiant or other federal law enforcement officers while wearing a recording device.  The CW paid LABOY $200 in cash and filled out a form describing his/her pain level and two additional forms regarding drug abuse.  The CW was taken to a backroom by an unidentified female employee.  This employee conducted a leg strength test and asked if the medication was working.  No vital signs were taken.  The CW returned to the "waiting room" with the conference table where other patients were also waiting.  Sometime later, the unidentified female employee gave the CW prescriptions for Oxycodone 30 mg, 60 pills; Colace 100 mg, 60 pills; Oxycontin 15 mg, 60 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills.  The prescriptions were signed by WEAVER, but the CW did not see WEAVER during his/her visit.  The CW overheard LABOY state that WEAVER was in the back of the office.

30.    On or about September 28, 2017, the CW visited the CHESTNUT STREET OFFICE under the direction of your affiant or other federal law enforcement officers while

16

wearing a recording device.  The CW filled out a form describing his/her pain level and paid LABOY $200 in cash.  While waiting, the CW overheard LABOY and an unidentified "patient" talking about his missed appointment.  The patient told LABOY "I can't get my scripts cashed until the first."  In my training and experience, getting prescriptions "cashed" is a common street term used by drug dealers to describe filling a prescription for pills in order to resell the pills for cash.  LABOY acknowledged the patient's statement, saying "Makes sense."  The CW was taken to a room by an unidentified female employee.  This employee asked about the CW's pain and if the medication was working.  As before, no physical exam was done and no vital signs were taken.  The CW returned to the outer "waiting room" area.  Sometime later, the unidentified female employee gave the CW prescriptions for Oxycodone 30 mg, 60 pills; Colace 100 mg, 60 pills; Oxycontin 15 mg, 60 pills; Zanaflex 4 mg, 90 pills; and Motrin 800 mg, 90 pills, all of which were signed by WEAVER.  The CW never saw WEAVER during his/her visit.

31.    Your affiant has been involved with the investigation and prosecution of other cases involving the running of "pill mill" operations, in which an expert witness was retained. Based upon my previous experience in these cases, I believe a retained expert witness would testify that the minimal medical examinations and procedures conducted by WEAVER in this case are inconsistent with the legitimate practice of medicine, and are consistent with running a "pill mill."

17

## Conclusion

32.     Based upon, but not limited to, the above facts, there is probable cause to find that

MARTIN D. WEAVER, M.D. and ERICA LABOY conspired together, and with others, to

illegally distribute Schedule II controlled substances by issuing prescriptions as discussed above

to the CW in December 2016, January 2017, February 2017, March 2017, April 2017, May

2017, June 2017, July 2017, twice in August 2017, and September 2017, outside the course of

professional practice and without a legitimate medical purposes, in violation of Title 21, United

States Code, Section 846.


BRYAN LACY
Special Agent
Federal Bureau of Investigation


SUBSCRIBED TO AND SWORN
before me on the 24th  day of October, 2017


HONORABLE JACOB P. HART
United States Magistrate Judge

18